## THE PROTECTION.

(Circuit Court of Appeals, Ninth Circuit. May 7, 1900.)

No. 561.

1. CARRIERS—BREACH OF CONTRACT TO CARRY GOODS—DEFENSES.

Representations made by a shipper as to the size and weight of a machine to be transported, although not correct, are no defense to a suit against the carrier for its failure to carry such machine on a particular vessel, in accordance with the terms of a bill of lading which was issued afterwards, and after the carrier's agents had seen the machine, and had opportunity to obtain full information as to its dimensions and weight.

2. SAME—RESCISSION OF CONTRACT OF CARRIAGE—TRANSFER OF BILL OF LADING.

After a bill of lading made negotiable by statute has been assigned by the shipper for value to another, the contract thereby made cannot be rescinded without the consent of the assignee, and the issuance of a second bill of lading to the shipper, without the surrender of the first or the consent of the assignee, cannot affect his rights under the first contract.

3. SAME—BREACH OF CONTRACT.

It is no defense to a suit for damages for the breach of a contract made by a bill of lading to transport goods by a particular vessel that the carrier afterwards forwarded the goods by another vessel without additional cost or risk to the shipper.

4. SHIPPING—MEASURE OF DAMAGES FOR LOSS OF CARGO.

A steamship company issued a bill of lading by which it contracted to transport a machine by a particular vessel from Seattle to Skagway, Alaska, which bill was indorsed to libelant, who proceeded to Skagway to receive the machine on arrival. The vessel, however, did not bring it, but it was forwarded by the company by another vessel, a month or so later, at which time libelant was not there to receive it, and it was entirely lost to him. *Held*, that as the usual rule that the measure of damages for loss of goods is their market value at the port of destination could not be applied, because of the impossibility of showing the value of the machine at Skagway, libelant was properly allowed as damages its cost at Seattle, together with his expenses in going to receive it and the freight paid.

Appeal from the District Court of the United States for the Northern Division of the District of Washington.

Gorham & Gorham, for appellants.

Richard A. Ballinger, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. It appears from the testimony that on the 21st day of January, 1898, one R. H. Ballinger, who was the owner of a steam sled sawing machine and four sled runners at Seattle, Wash., entered into an agreement with W. H. Lord (libelant herein) by the terms of which he sold to Lord a one-half interest in the machine, and agreed to transport the same from Seattle to Skagway, Alaska, "as early as the same may be conveniently done," at his own expense. Authority was also given Lord to sell the one-half interest of Ballinger in said machine upon its arrival at Skagway, in accordance with the terms and conditions in said agreement specified. After

the execution of this agreement, to wit, on the 25th day of January, 1898, Ballinger received from the Columbia Navigation Company an ordinary receipt for $62.50 for freight and wharfage on said machine, to be forwarded on the steamship Protection. Lord visited the office of the company, and notified it that he was interested in the machine, and that it was important that it should be forwarded at an early day; that he was going to Skagway, and would be there to receive it. He was assured that it would be shipped on board the Protection; "that as soon as the Protection came in it would certainly go." Lord left Seattle on January 27th, and arrived at Skagway, February 7th. It further appears that, pursuant to the previous agreement between the parties, the machine and sled runners were delivered at the ship's tackle on the dock at Seattle, freight and wharfage thereon amounting to $62.50 having been previously paid; that a bill of lading was issued January 29th to Ballinger, by a duly-authorized agent of said company, reciting that the machine and sled runners had been shipped in apparent good order and condition by R. H. Ballinger on board of the steamer Protection; that it contained an agreement on the part of said company to carry said property on the said vessel to Skagway, and there deliver the same in like good order and condition at the vessel's tackle unto R. H. Ballinger or his assignee; this bill of lading was afterwards duly indorsed by Ballinger, and transmitted by mail to libelant, Lord, who had previously gone to Skagway to receive said property, there expecting to operate the same as a movable sawing machine; that the sawing machine, pursuant to the shipping receipt issued by said company, was by Ballinger delivered to said company at the Centennial Wharf before the arrival of the steamer Protection, and prior to the issuance of said bill of lading, and thereafter, for the convenience of said company, and at the joint expense of it and said Ballinger, it was transferred from the Centennial Wharf to the Yesler Dock, and there delivered alongside the Protection and of the ship's tackle, in the presence of the ship's officers and Richard Chilcoot, the duly-authorized agent of said company; that the steamer Protection made the run from Seattle to Skagway according to expectations, but did not take the machine nor the sled runners, and the only excuse offered for the failure to fulfill the contract is that the machine was too large and heavy to be carried on said vessel; that the company afterwards sent the property to Skagway on a scow, which was towed up with the ship Prussia, which arrived there more than a month later than the date on which the Protection arrived; that in consequence of the delay there was no one on hand at Skagway to receive the property, and it has been wholly lost to the libelant. A second bill of lading for the Prussia was thereafter issued by the company, February 21, 1898, after its failure to send the machine up by the Protection, and this bill of lading was put into the hands of said Ballinger, after the first bill of lading had been indorsed by him and mailed to the libelant at Skagway, without having received the surrender of the first bill of lading. Upon these facts the district court entered a decree in favor of libelant against the steamer Protection for failure to deliver said property according to the terms of said contract of affreightment,

and awarded damages in the sum of $1,787.50, from which this appeal is taken.

It is claimed by appellants that the steamship company was misled by the shipper concerning the size and dimensions of the sawing machine, and that the misrepresentations in regard thereto, though unintentional, render the contract voidable, at the option of the carrier; and that the carrier having rescinded the original contract, and entered into a new agreement for transporting the machine by the Prussia, the libelant cannot recover upon the first bill of lading for the shipping of the machine on the Protection.

In relation to the alleged misrepresentations there is some conflict in the evidence. There is no pretense that Ballinger intentionally misrepresented the size of the machine. The inquiries made by the company and answers given by Ballinger upon this point were prior in time to the issuance by the company of the bill of lading. Before this contract was entered into the officers and agents of the steamship company had seen the machine, and had the opportunity to obtain the necessary information as to its dimensions, size, and weight. Under these circumstances, the prior conversations and alleged misrepresentations as to the size of the machine become wholly immaterial, and it is unnecessary to examine the evidence, and determine whether or not any mistake or misrepresentation was made by the shipper. The company made no objection upon this ground, but signed the bill of lading with the full knowledge of the character of the machine. In fact, no such objection was made by the company either before or after the Protection sailed. It cannot, therefore, urge this point as a legal defense to the libel brought to recover damages for a breach of the contract.

The law is well settled that a party cannot avoid a contract on the ground of misrepresentation if he has personal knowledge of the facts, and acts upon his own information and observation. Slaughter's Adm'r v. Gerson, 13 Wall. 379, 383, 20 L. Ed. 627; Farnsworth v. Duffner, 142 U. S. 43, 47, 12 Sup. Ct. 164, 35 L. Ed. 931; E. Bement & Sons v. La Dow (C. C.) 66 Fed. 185, 188. The authorities upon this point are too numerous to require further citation.

In relation to the alleged second bill of lading on the Prussia, given by the company to Ballinger, there is a mass of evidence, more or less conflicting in its nature, which, under the views we take of this question, it will be unnecessary to examine in detail. It is not shown that Ballinger assumed any responsibility as to the subsequent bill of lading, or made any statement that he was authorized to accept it in lieu of the other. He was extremely anxious to have it forwarded to Skagway in time to have it accepted by Lord, and repeatedly stated that if Lord would accept it upon the arrival of the Prussia it would be all right, but the company was expressly notified by Ballinger that he no longer had any control over the first bill of lading.

There is no claim that there was any new consideration for the second or new contract. The controlling question on this branch of the case is whether Ballinger had any legal power or authority to consent to any change of the first contract which had been assigned by him,

and forwarded to the libelant at Skagway. The testimony shows that the steamship company tried to rescind the first contract. But it takes two parties to make a bargain. There was no mutuality. Even Ballinger, who, if it could be held he had the authority to consent, did not accept the second bill of lading, except upon conditions that were never complied with. The fact is, as shown by the record and found by the court, that neither Ballinger nor Lord ever waived any rights acquired by them under the first bill of lading. As a matter of law, Ballinger could not rescind it without the consent of Lord. He had indorsed and assigned the bill of lading and forwarded it to Lord in good faith and for value. This passed the legal title to the libelant, and the subsequent issuance by the company of the second bill of lading, without any surrender of the first, and without the consent of the libelant, could not affect the rights acquired and held by him under the first contract.

The statute of Washington expressly declares that all bills of lading are negotiable, and may be transferred by the indorsement of the party receiving it, and that all the title to the machine which the first holder had "when he receives it passes to every subsequent indorsee thereof in good faith and for value, in the ordinary course of business, with like effect and in like manner as in the case of a bill of exchange." Ballinger's Ann. Codes & St. §§ 3598, 3599. The steamship company, therefore, became liable to libelant upon its first contract, and had no legal right to rescind it without his consent, which was never obtained. The fact that the company shipped the machine on a scow towed by the Prussia, without any additional cost or risk, cannot be urged as a defense to the libel for the breach of the original contract.

In Harrison v. Stewart, Taney, 485, Fed. Cas. No. 6,145, the court, upon somewhat similar facts, said:

"Neither can the opportunity which offered of shipping the goods by the Andalusia, without any additional cost or risk to the libelants, be used as a bar or in mitigation of damages. The shippers were not bound to seek or accept any other mode of conveyance. It was the duty of the shipowners to transport the goods in the manner specified in the bill of lading, and that contract required that they should be carried to the port of destination in the ship Charles. Nothing could excuse them from the performance of that duty but some unforeseen event, which they had not the power to control; and, if they failed to perform it, it is no excuse to say that the libelants might have accomplished the same object by another ship or another contract. The shippers had a right to the faithful execution of the contract they had made, and to rely upon it, and were under no obligation to look further or accept any other contract as a substitute for it."

The only remaining question relates to the amount of damages. The libelant claims damages (1) for the actual expenses incurred by him; (2) for the loss of anticipated profits from the operation of the machine in Alaska; and (3) the value of said machinery, including freight and wharfage.

The court, following the general rule that where the shipper or consignee has entered into a contract made with reference to embarking in a new business, held that the speculative profits which might be supposed to arise, but which were defeated because of the carrier's delay in delivering the material necessary therefor, cannot be looked

to as an element of damages, being too indefinite and uncertain to constitute a basis of recovery. This ruling was in favor of the appellants.

There is no specific objection to the allowance of $100 for the actual expenses proven to have been incurred by the libelant. But appellants object to the allowance by the court of the sum of $1,625 for the value of the machine. The cost and construction of the machine at Seattle are shown by the evidence to have been $1,625. The court in its opinion said: "There is no evidence as to its value at Skagway, and, in the nature of things, it is impossible for the libelant to prove by witnesses the actual value at Skagway." The contention of appellants is that the value at the point of destination governs the allowance of damages. "The general rule is that in case of a loss of the goods the measure of damages recoverable by the shipper is the market value of the goods at the point of destination, with interest from the time they should have been delivered, less the amount of the freight charges due for their transportation." 5 Am. & Eng. Enc. Law (2d Ed.) 373, and authorities there cited. But this rule is not universal. It is subject to be changed by special circumstances. In the present case we are of opinion that the court's ruling was favorable to appellants because the value at the place of shipment may, ordinarily, be presumed to be less than at the place of destination, and, in the absence of any proof to the contrary, it cannot be said that the court committed any error. We agree with the court below that, under all the circumstances of this case, "it is simple justice for the respondent to compensate the libelant for his expenses, and, pay as the value of the property what it cost at Seattle, and repay the freight money and wharfage." The decree of the district court is affirmed, with costs.