WATERS and another, Receivers, Appellants, vs. BECKER, Respondent.

*December 13, 1921—January 10, 1922.*

*Carriers: Excessive freight charges: Rights of parties: Demurrage: Conversion: Damages: Unpaid freight: Reconsignments: ·Reasonableness and validity of regulations: Jurisdiction of interstate commerce commission and of state court.*

1. Where the initial carrier of a shipment of coal quoted the same rate charged by other carriers, but on arrival of the coal at its destination it was discovered that the carrier had never published such rate, and that the rate according to the tariff in force was larger, the consignee was under no obligation to accept the coal and pay the illegal rate and afterwards seek his remedy.

2. The fact that a bill of lading covered a shipment of coal and gave the carrier the right to make a reasonable charge for storage of property not removed within forty-eight hours, gave it no right· to hold the coal in the cars for six months after· the consignee refused to accept it and charge storage therefor, where the refusal to accept was due to an excessive freight rate.

3. In determining the damages ·for the conversion of shipments of coal by the carrier, the freight charges, when unpaid, should be deducted from the fair market value of the coal at the point of destination, this fully compensating the shipper, who should not be permitted to profit because the contract was not performed. If the freight has been paid the amount should be included as part of the damages.

4. The interstate commerce commission having jurisdiction over the tariff regulations and practices relating to reconsignments, the circuit court had no jurisdiction to determine a claim of the consignee for conversion when the validity of the claim was dependent upon whether or not a regulation of the carrier as to reconsignments was proper.

5. The carrier's claims for demurrage charges accruing on coal accumulating at a certain point, as the result of a dispute over the validity of an order affecting the consignee's reconsignment rights, having been submitted to the interstate commerce commission, were not within the jurisdiction of the state circuit court.

6. Under sec. 9 of the Interstate Commerce Act (4 Fed. Stats, Ann. (2d ed.) p. 432), where the consignee invoked the jurisdiction of the interstate commerce commission respecting the

interpretation and validity of a carrier's tariffs relating to reconsignments, charges for demurrage, and reconsignment and reparation claims, and the commission passed on most of the questions but had never made any final order of reparation or determination of the amount to be paid, the consignee had elected his remedy and could not thereafter bring action in the circuit court to recover demurrage and reconsignment charges claimed to have been illegally collected.

7. The consignee having submitted the question of damages for delay in delivery due to a dispute over his reconsignment rights to the interstate commerce commission, which held that he had failed to use due diligence to avoid loss and could not properly be awarded damages for his loss, was, under secs. 8 and 16 of the Interstate Commerce Act (4 Fed. Stats. Ann. (2d ed.) pp. 430, 475), bound by his election in choosing the commission as the forum for relief, and could not bring action in the state circuit court to recover such damages.

APPEAL from a judgment of the circuit court for Milwaukee county: E. T. FAIRCHILD, Circuit Judge. *Affirmed in part; reversed in part.*

This is an appeal by the plaintiffs, *Dudley E. Waters* and *Frank W. Blair,* as receivers of the Pere Marquette Railroad Company, from a judgment for $12,442.13, damages awarded to defendant on his counterclaims.

The pleadings include four causes of action and seven counterclaims, of which the third cause of action, the first, third, and fourth counterclaims are involved in this appeal.

For the appellants there were briefs by *Van Dyke, Shaw, Muskat & Van Dyke* of Milwaukee, and oral argument by *Douglass Van Dyke.*

*Thomas H. Gill* of Milwaukee, for the respondent.

### Third cause of action.

JONES, J. The complaint alleged that defendant caused to be shipped to him at Milwaukee six cars of coal which arrived during the months of October, November, and December, 1914; that although notified repeatedly, defendant refused to receive or reconsign the cars; that since there was no other storage place available the coal was allowed

to remain on the cars until June 10, 1915, on which date plaintiff sold the coal for $594.60 in an effort to collect the lawful charges; and that there remained due to plaintiff for freight and demurrage charges the sum of $1,187.87.

Defendant admitted the shipping of the six cars and explained that his failure to dispose of them was due to a controversy over freight rates with the Baltimore & Ohio Railroad Company, the road upon which the shipment originated. Defendant alleged that it was the duty of the plaintiff to unload and store the coal within a reasonable time after his refusal to accept it; that the sale by plaintiff was a conversion of his property; and that defendant is entitled to damages for this conversion to the amount of the market value of the coal at the time and place of conversion, with interest.

The evidence shows that the cars in question had been shipped by defendant on the Baltimore & Ohio Railroad on its assurance that the rate to Milwaukee over that and plaintiff railroad was the same as upon other lines from the same districts, $2.65 per ton; that upon arrival at Milwaukee it was discovered that the Baltimore & Ohio had failed to publish such tariff; and that the rate, according to the Baltimore & Ohio tariffs then in force, was $2.94 per ton. Defendant tendered payment based on the rate of $2.65 per ton and was refused disposition of the cars. Plaintiff's agent attempted to get a correction of the rate from the Baltimore & Ohio but was unsuccessful, and, after a correspondence with defendant, sold the coal for $2.05 per ton.

The trial court found, in addition to the facts stated, that under the circumstances ten days was a reasonable time in which plaintiff should have unloaded and stored the coal; that demurrage should be charged during such ten-day period at the rate of $1 per day per car; that the total freight was $731.47; and that the amount of coal sold was 300 tons and 1,200 pounds, of the market value of $4.65 per ton at Milwaukee.

He held as matters of law that it is the duty of a carrier, when freight has not been disposed of within a reasonable time, to unload and store the same for account of the owner; that under this rule plaintiff was not entitled to charge demurrage for coal left in the cars beyond a reasonable time; that ten days in this case was a reasonable time in which to unload and store the coal; and that defendant was entitled to damages for the conversion of the coal in accordance with the facts stated above.

In the counterclaims, objections to the jurisdiction of the court were raised. No such question arises in this cause of action.

The trial court found that, when the difference arose as to the freight rate, both the consignee and the reconsignee at once refused to accept the coal. Counsel for the parties disagree on this point, but the record seems to justify the finding. There was testimony tending to show that the agent of plaintiff agreed to rectify the mistake as to the rate, but nothing was accomplished in that direction and the coal was left standing in the cars for several months. It might have been better business management for defendant to accept the coal, pay the illegal rate, and afterward seek his remedy, but it cannot be said that he was under obligation to do so. It certainly was very bad management for the carrier to hold the coal in the cars for so many months and then sell it for about half of the freight and demurrage charges.

Plaintiff's counsel rely on the bill of lading as an agreement justifying their contention. The bill of lading gives to the carrier the right to make a reasonable charge for storage of property not removed within forty-eight hours, and provides for a lien for such charges. But we do not construe the contract as one which gives the carrier the right to charge storage for an indefinite and unreasonable time when the refusal of the consignee to accept is due to a rate conceded to be excessive. Neither the interests of the par-

ties nor those of the public are promoted by using cars as warehouses for six months at a time.

It is urged by plaintiff's counsel that if the carrier had unloaded and stored the coal it would have caused some degradation. This is doubtless true, but if plaintiff had used due care in so doing the loss would have been the loss of defendant.

The plaintiff after holding the coal in its cars for several months concluded to sell it, with the result already stated. No good reason is shown why the plaintiff might not have taken steps to relieve the situation at an early date when it was known that defendant would not accept the shipment; thus the loss would have been greatly minimized if not avoided.

Plaintiff's counsel cite cases sustaining charges for demurrage pending disputes as to proper freight rates, in some instances for considerable periods of time. It will serve no good purpose to discuss these cases for the reason that the facts differ so materially.

In view of the peculiar facts of this case and plaintiff's long delay to act after knowledge of defendant's refusal to accept the coal, we do not find that there is any clear preponderance of evidence against the findings of the trial court in this cause of action, and the judgment in respect to it is affirmed.

### First counterclaim.

Defendant alleged that between May 17, 1911, and January 1, 1914, plaintiff converted upwards of 2,300 tons of coal in its possession for delivery to defendant, six of these cars being those mentioned in the third cause of action. Certain of these cars were eliminated at the trial. With the exception of seven, plaintiff admitted the conversion of the others, and by way of setoff claimed $480 alleged to be due as demurrage on eight of the cars converted at Ludington, Michigan. The material facts respecting the claims in controversy are as follows:

Milwaukee is the western terminus of plaintiff railroad. Coal is received by plaintiff from Eastern lines at Toledo, Ohio, transported to Ludington, Michigan, on its rails, and thence across the lake to Milwaukee on car-ferries. There are two rates to Milwaukee: the local rate for coal used in Milwaukee, and a lower through rate for coal going beyond.

Defendant had no storage yards, but shipped large amounts of "free coal" to be sold and reconsigned in transit. To facilitate such reconsignment and to advise the carrier that the coal was entitled to the through rate, the coal dealers were instructed to bill the coal to some point beyond Milwaukee, and the coal so billed would be held at Ludington, Michigan, for reconsignment. In 1910 plaintiff instructed defendant to use Elm Grove, a station a short distance beyond Milwaukee on the line of the Chicago, Milwaukee & St. Paul Railway Company, as such blind billing point. It appears that for some years coal billed in this manner was in fact taken to Milwaukee and there reconsigned instead of being held at Ludington for reconsignment.

On October 10, 1912, plaintiff notified defendant that unless he desired his coal held at Ludington for reconsignment, all coal billed to Elm Grove would come forward to Milwaukee to be turned over to the St. Paul road unless other disposition had been ordered previous to its arrival at Ludington. In the same letter plaintiff stated it would notify defendant when his cars passed Toledo, and that defendant should telephone his reconsignment orders to the agent at Milwaukee and also confirm the orders by letter to the agent of the St. Paul road at Milwaukee. On November 15, 1912, plaintiff advised defendant that cars billed to Elm Grove' would be delivered at Milwaukee to the St. Paul road and that arrangements should be made with that company to prevent the coal being shipped as billed.

Defendant protested against the orders requiring him to reconsign prior to the arrival of the cars at Ludington, and insisted that he had a right to this service at Milwaukee.

He gave notice of his intention to take the matter before the interstate commerce commission.

During the pendency of this dispute a large number of cars accumulated at Ludington. Some of these were taken over by plaintiff and used as fuel. Others, after a long delay, were brought forward to Milwaukee and disposed of by defendant.

After November 15, 1912, seven cars billed to Elm Grove were delivered by plaintiff to the Chicago, Milwaukee & St. Paul Railway Company at Milwaukee and by it taken to Elm Grove. Defendant alleged this to be a conversion, claiming that the cars should have been held at Milwaukee for reconsignment. Plaintiff contended that proper passing notices had been given, and that defendant had failed to reconsign or order the cars held at Ludington, and that as a consequence the cars were delivered in accordance with plaintiff's stated rules.

The trial court held that there was a conversion of the seven cars, the value of the coal being $5.50 per ton, including the freight rate, $2.05 per ton. He refused to allow plaintiff's claim for $480 demurrage charges.

Plaintiff admits the conversion of a large amount of coal and that defendant is entitled to judgment for its value less the freight and less a setoff of $480 claimed as demurrage which was charged at Ludington. The only matters remaining to be disposed of in this counterclaim are (1) the measure of damages for the coal plaintiff admits having converted; (2) the jurisdiction of the court of the claim that cars were converted at Elm Grove; and (3) the jurisdiction of the court as to plaintiff's claim for demurrage accruing at Ludington.

(1) *Measure of damages.*

The trial court found as a conclusion of law:

"That the rule of damages in this state for the conversion of defendant's coal by the plaintiffs as found is the fair mar-

ket value of such coal at Milwaukee, at the time it should have arrived there, less the lawful freight charges, with interest on such sum at the rate of six per cent. per annum from the date of the taking to the date of the judgment of this court."

Defendant takes exception to this rule of damages and contends for the fair market value of the coal at the proper point of destination, including the freight charges, although they have not been paid. Defendant's counsel does not claim that exemplary damages should be awarded for the conversion of the coal. The reasons given by the railroad company for such conversion are that there were pending differences concerning freight rates, and a large accumulation of cars at Ludington, where most of the coal was converted, and that in order to prevent heavy charges for demurrage and to keep the tracks clear and the cars in use it was deemed best to use or dispose of the coal. It appears from cases in other states that it is not an uncommon thing for railway companies to thus dispose of or use coal in emergencies. Of course if such action is taken, just compensation must be made to the shipper.

The question whether the carrier is entitled to deduct the freight charges under such facts as are here involved has not been decided in this state. Counsel for defendant have cited *Marshall v. American Exp. Co.* 7 Wis. 1; *Boehrer v. Juergens & Anderson Co.* 133 Wis. 426, 113 N. W. 655; *Sanderson v. Cream City B. Co.* 110 Wis. 618, 86 N. W. 169; and *Ingram v. Rankin*, 47 Wis. 406, 2 N. W. 755. But neither of these cases discusses the rule of damages when a carrier has converted the goods and the deduction of freight is claimed.

Counsel for appellants cite *Hammer v. Schœnfelder*, 47 Wis. 455, 2 N. W. 1129, to sustain their contention that compensation for the actual loss of the shipper is the true measure of damages. In other states the great weight of authority is to the effect that the measure of damages for the conversion of goods by a carrier is the same as for their loss

or destruction; that is, their value at the place of destination with interest, less the cost of transportation. 6 Cyc. 531; 3 Sedgwick, Damages (9th ed.) § 844; 3 Hutchinson, Carriers (3d ed.) § 1374; 10 Corp. Jur. p. 403; 4 Ruling Case Law, "Carriers," § 393; *Roth Coal Co. v. L. & N. R. Co.* 142 Tenn. 52, 215 S. W. 404, citing many cases; *Horton v. T. & G. R. Co.* 225 Fed. 406; *Briggs v. B. & L. R. Co.* 6 Allen (88 Mass.) 246; *Wallingford v. Kaiser,* 191 N. Y. 392, 84 N. E. 295.

The reason for the rule is that the shipper is thus fully compensated and should not profit because the contract of carriage has not been performed. By this rule, if the property has increased in value the shipper has the benefit of such increase. Thus the owner has the benefit of the transportation in the same manner as if the goods had been delivered; and it is evidently not just that he should recover as damages the freight which he has not paid. If the owner has paid the freight, of course the amount so paid should be included as part of the damages.

Our conclusion is that the trial court applied the correct rule in ascertaining the measure of damages for coal converted by plaintiff.

(2) *Jurisdiction of the circuit court as to the conversion of Elm Grove cars.*

The trial court filed the following conclusions of law:

"1. That this court has jurisdiction to dispose of all claims of both plaintiffs and defendant, without entry of formal order of the interstate commerce commission fixing the exact amount of the demurrage and reconsignment charges allowed by the commission's order to each party.

"2. That all items of both parties sued upon in this action are in fact common-law liabilities and none of them need for validation the exercise of the administrative or other functions of the interstate commerce commission."

Appellants' counsel insist that the court erred in taking

jurisdiction of the claim relating to the Elm Grove cars. If the railroad company wrongfully caused the cars to be delivered at Elm Grove instead of Milwaukee there was a conversion. If, however, the rule adopted by the railroad company, that the cars after a certain time would be delivered to the places named in the bills of lading, was a proper rule, and if the notices sent the defendant as to the mode in which the cars should be held effective, there was no conversion of the seven cars.

When we come to the third and fourth counterclaims it will appear that both parties to this litigation have assumed that it is within the province of the interstate commerce commission to deal with the tariffs, rules, practices, and regulations which relate to the reconsignment of cars engaged in interstate commerce.

The Interstate Commerce Act makes it the duty of carriers to provide reasonable facilities for operating through routes and make reasonable regulations in respect thereto; to make reasonable regulations for the transportation of goods; to afford all reasonable facilities for the interchange of traffic between their respective lines. The commission is given broad powers, after a hearing, to make its rules as to such regulations and practices.

It seems clear to us that the practice of the railroad company in respect to the reconsignment of the cars in question was within the jurisdiction of the commission. It will be seen that in the third and fourth counterclaims, still to be discussed, there are additional reasons for holding that the circuit court should not have taken jurisdiction of these matters as to the proper reconsignment of cars, but we think that the same principle applies to the Elm Grove cars; and since facts as to these cars also have a bearing on the claims of defendant in the third and fourth counterclaims, it seems best that the whole subject of tariff regulations and practices as to reconsignments should be left to the interstate commerce commission.

(3) *Plaintiff's claim for demurrage.*

In the reply to this counterclaim, plaintiff made claim as a setoff for certain demurrage charges which had accrued at Ludington, as provided in tariffs duly filed and published pursuant to the provisions of the act to regulate commerce. The whole subject of demurrage accruing at Ludington was submitted to the interstate commerce commission and the circuit court had no jurisdiction of the question.

### *Third counterclaim.*

Defendant alleged that by reason of a decision of the interstate commerce commission plaintiff was bound to repay to defendant for reconsignment and demurrage charges unlawfully exacted between October 17, 1912, and December 17, 1912, the sum of $612; that upon the same account for the period from December 18, 1912, to February 9, 1913, the sum of $374 was due and owing; and that for similar unlawful charges from February 9, 1913, to April 10, 1914, the sum of $24 was due and owing.

Plaintiff admitted these items to be recoverable with the exception of $514, but alleged that the interstate commerce commission had exclusive jurisdiction of the matter contained in this counterclaim.

The above claims arose as a result of plaintiff's interpretation of its tariff, under which reconsignment and demurrage charges were exacted for cars held at Ludington as a result of defendant's failure to reconsign them before they reached that point. Two hearings were had before the interstate commerce commission, at which defendant claimed reparation for demurrage and reconsignment charges and general damages for delay in forwarding his cars.

The commission in two decisions laid down rules governing the reconsignment and demurrage charges exacted at Ludington and Milwaukee, but deferred an order of reparation until the parties should submit statement of claims based on the rules so laid down. Defendant presented his

claims, and plaintiff admitted all with the exception of $514. No formal order was ever. made. The commission denied defendant's claim for general damages for delay in the forwarding of cars.

The trial court held that the amount of defendant's claims as alleged had been found to be due by the commission and included them in the judgment, stating that the court had jurisdiction regardless of the fact that the commission had made no formal order of reparation.

It will serve no useful purpose to enumerate in detail all the proceedings before the interstate commerce commission in respect to the matters involved in this counterclaim. The proceedings related to the interpretation of tariffs and their validity, charges for demurrage, reconsignment, reparation claims, damages for delay in forwarding cars, and charges of discrimination. Two very elaborate decisions were rendered by the commission. The claims of each party were in part denied and in part sustained. It was claimed in these proceedings that the railroad company had done things prohibited and declared unlawful by the act to regulate commerce and omitted to do other acts required to be done, and that under sec. 8, 4 Fed. Stats. Ann. (2d ed.) p. 430, there was liability for damages sustained.

So far as material, sec. 9 is as follows (24 U. S. Stats. at Large, 382, ch. 104):

*Persons damaged may complain to commission, or sue personally.* "That any person or persons claiming to be damaged by any common carrier subject to the provisions of this act may either make complaint to the commission as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this act, in any district or circuit court of the United States of competent jurisdiction; but such person or persons shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt."

Sec. 13, 4 Fed. Stats. Ann. (2d ed.) p. 453, provides for the making of complaints and their investigation by the commission.

Sec. 16, 4 Fed. Stats. Ann. (2d ed.) p. 475, provides:

(A) *Enforcing orders of commission—Payment of money damages.* "That if, after hearing on a complaint made as provided in section 13 of this act, the commission shall determine that any party complainant is entitled to an award of damages under the provisions of this act for a violation thereof, the commission shall make an order directing the carrier to pay to the complainant the sum to which he is entitled on or before a day named."

It is further provided that if a carrier does not comply with an order for the payment of money within the time limit in such order, the person for whose benefit the order was made may file in the circuit court of the United States, or in any state court having general jurisdiction of the parties, a petition setting forth the causes for which he claims damages, and the order of the commission, and that in such court the findings and order of the commission are to be *prima facie* evidence of the facts therein stated.

When the proceedings were commenced before the interstate commerce commission, it was a case where the practices and mode of doing business of the carrier were attacked as unfair and unreasonable and where the railroad company's interpretation of a tariff was involved. The decision of these questions called for the exercise of the judgment and discretion of the administrative power which is vested by Congress in the commission. *Pennsylvania R. Co. v. Clark Bros. C. M. Co.* 238 U. S. 456, 35 Sup. Ct. 896; *Interstate Comm. Comm. v. Ill. Cent. R. Co.* 215 U. S. 452, 30 Sup. Ct. 155; *Morrisdale C. Co. v. Pennsylvania R. Co.* 230 U. S. 304, 33 Sup. Ct. 938. Until that body had declared the practices to be unjust and unfair, no court had jurisdiction of the subject. *Texas & Pac. R. Co. v. Abilene C. O. Co.* 204 U. S. 426, 27 Sup. Ct. 350; *Pennsylvania R.*

*Co. v. Clark Bros. C. M. Co.* 238 U. S. 456, 35 Sup. Ct. 896; *Baltimore & O. R. Co. v. U. S. ex rel. Pitcairn C. Co.* 215 U. S. 481, 30 Sup. Ct. 164; *R. J. Darnell, Inc. v. Ill. Cent. R. Co.* 190 Fed. 656.

In *Siggins v. C. & N. W. R. Co.* 153 Wis. 122, 140 N. W. 1128, it was held that where there had been an overcharge for freight on an interstate shipment due to misrouting, the overcharge could not be recovered in an action in the state court for money had and received and that the interstate commerce commission had exclusive jurisdiction of the subject.

Defendant's counsel cite a recent case of this court, *Waukesha G. & E. Co. v. Waukesha M. Co., ante,* p. 420, 184 N. W. 702, which relates to the jurisdiction of the Wisconsin railroad commission, in which it was held that the commission had no jurisdiction to redress grievances arising from past conduct of a utility. In this decision Mr. Justice OWEN referred to the distinction between the interstate commerce act and the Wisconsin statute, and in his quotation from a decision of the supreme court of the United States it is said:

"In a suit where the rule of practice itself is attacked as unfair or discriminatory, a question is raised which calls for the exercise of the judgment and discretion of the administrative power which has been vested by Congress in the commission."

There is an additional reason why the circuit court should have refused to take jurisdiction of the subject involved in this counterclaim. The defendant had invoked the jurisdiction of the interstate commerce commission and asked relief in respect to the identical matters now in dispute. After long investigation, the commission passed on most of the questions in issue, but never made any final order of reparation and has never determined the amount to be paid. The commission suggested that the parties should be able to agree as to certain disputed matters and deferred the allowance of reparation. Evidently the parties have not agreed, and

while the proceeding before the commission was pending this action was brought in the state court, and the counter-claims were filed which bring before us the subject of juris-diction. It seems to us very clear that since defendant elected to pursue his remedy under the federal act he was bound to abide by its terms, including the provisions of sec. 9, above quoted. In *Pennsylvania R. Co. v. Clark Bros. C. M. Co.* 238 U. S. 456 (35 Sup. Ct. 896), the court said (p. 472):

"This is not to say that the finding of the commission as to the amount of damages has any other effect than that pre-scribed in sec. 16 of the act. It is simply to hold that the plaintiff, having demanded and obtained the appropriate rul-ing from the commission as to the discrimination which had been practiced, was then entitled to proceed for the recovery of damages in accordance with the act and not otherwise. The fact that the commission had not made its award of damages is immaterial. The proceeding before the com-mission was pending and the plaintiff's right and remedy were fixed by the federal act." *Franklin v. P. & R. R. Co.* 203 Fed. 134.

### Fourth counterclaim.

Defendant alleged that by reason of plaintiff's delay in the transportation of his coal from Toledo, Ohio, to Mil-waukee, Wisconsin, he failed to fill some of his contracts and was later forced to sell his coal on a falling market, sustaining loss in the sum of $2,461.68. This claim em-braces seventeen cars delivered to Brookfield and Elm Grove, Wisconsin, without a previous notification to defendant of their arrival at Ludington, and two groups of eight and fif-teen cars held by plaintiff at Ludington during the dispute concerning reconsignment rights mentioned in the first and third counterclaims.

Plaintiff replied that as to the cars held pending the dis-pute the interstate commerce commission had exclusive juris-diction, and that defendant had presented a claim before that body which had been disallowed and that the claim was *res adjudicata.*

The trial court held that there had been unreasonable delay; that the claim was a common-law cause of action, and found the damages to be as follows: on the seventeen cars, $984.30 with interest from January 4, 1913; on the eight cars, $445.06 with interest from March 1, 1912; on the fifteen cars, $917.46 with interest from March 1, 1913.

The plaintiff claims that there should be deducted from the judgment the sum of $445.06, and interest allowed for the delay in transportation of eight cars, and the sum of $917.46, and interest allowed for a similar delay in the transportation of fifteen cars.

The subject of damages for the delay as to these two groups of cars was submitted by defendant to the interstate commerce commission and fully considered. The commission held that the coal company failed to use due diligence to avoid loss in the matter complained of and that damages could not properly be awarded for such losses, if any, as resulted from the detention of the cars. Defendant's counsel now urge that the remedy of the coal company is a common-law remedy and at any time enforceable in the courts alone.

Secs. 8 and 16 of the Interstate Commerce Act (4 Fed. Stats. Ann. (2d ed.) 430, 475), already quoted, give specifically the right of those claiming to be damaged by the common carrier to make complaint to the commission, and the power is given the commission to make its award of damages and to order payment. Under the construction which has been given to these sections by the United States supreme court, we can see no reason why jurisdiction was not properly taken of the controversy by the commission. *Meeker v. L. V. R. Co.* 236 U. S. 412, 35 Sup. Ct. 328; *Morrisdale C. Co. v. Pennsylvania R. Co.* 230 U. S. 304, 33 Sup. Ct. 938.

According to the authorities cited in this opinion as to the third counterclaim the defendant is bound by his election in choosing the interstate commerce commission as the

forum for relief, and the sums of $445.06 and $917.46, with interest, should be deducted from the judgment.

The judgment of the court in the third cause of action is affirmed.

In defendant's first counterclaim the judgment of the court awarding damages for coal admitted by plaintiff to have been converted is affirmed. The claim for the conversion of the seven Elm Grove cars should be dismissed for the reason that the court had no jurisdiction, and there should be deducted from the judgment the sum of $225.04, with the interest. The plaintiff's setoff claiming demurrage should be disallowed for the reason that the court had no jurisdiction.

The defendant's third counterclaim should be disallowed for the reason that the court had no jurisdiction, and the sum of $1,010 should be deducted from the judgment.

Defendant's counterclaim for delay of eight cars and fifteen cars should be disallowed, and the sums of $445.06 and $917.46, with the interest, should be deducted from the judgment.

*By the Court.*—Cause remanded, with directions to enter judgment as indicated in this opinion, with costs to appellants.